[No. A030570. First Dist., Div. Three. May 30, 1986.]

ORINDA ASSOCIATION, Plaintiff and Appellant, v.
BOARD OF SUPERVISORS OF CONTRA COSTA COUNTY et al.,
Defendants and Respondents.

FRIENDS OF THE ORINDA THEATRE et al.,
Plaintiffs and Appellants, v.
COUNTY OF CONTRA COSTA et al., Defendants and Respondents;
CLARK WALLACE et al., Real Parties in Interest and Respondents.

1148

COUNSEL

McCutchen, Doyle, Brown & Enersen, Antonio Rossmann, Gail K. Hillebrand, J. Bradley O'Connell, Nancy C. Shanahan, Pillsbury, Madison & Sutro, Walter R. Allan, James N. Roethe and William G. Alberti for Plaintiffs and Appellants.

John B. Clausen and Victor J. Westman, County Counsel, and Silvano B. Marchesi, Assistant County Counsel, for Defendants and Respondents.

Miller, Starr & Regalia, Edmund L. Regalia, John G. Sprankling, Karl E. Geier and Amy Matthew for Real Parties in Interest and Respondents.

**OPINION**

**SCOTT, J.**—This appeal is from a judgment in an action consolidating petitions for writ of mandate brought by appellants Friends of the Orinda Theatre (Friends), Berkeley Architectural Heritage Association (BAHA), and the Orinda Association (the Association) to challenge various aspects of a proposed mixed-use office/commercial/retail development complex known as "the Crossroads," to be built in the downtown area of Orinda adjacent to the Highway 24 freeway.

The Association charges that the responsible county governmental and administrative agencies approved the Crossroads Project (the Project) and granted zoning variances therefor in violation of applicable local land-use regulations. Friends and BAHA focus on the Project's destruction of the Orinda Theatre and the adjoining Bank Building, designed by the same architect in the "Art Deco" style; they challenge the County's compliance with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.), the certification of the final project EIR by the Board, and the county building inspection department's issuance of an unqualified permit for demolition of the subject buildings.

I

The Association filed its petition for writ of mandate and complaint for injunctive relief on September 27, 1984, naming the Contra Costa County (County) Board of Supervisors (the Board) and the Orinda Area Planning Commission (the Planning Commission) as respondents, and naming the Crossroads Associates, Clark Wallace and Paul Learner, the owners and developers of the subject property, as real parties in interest and defendants. The Association's petition sought a writ of mandate compelling the Board and the Planning Commission to vacate their approval of the development plan and zoning variances for the proposed Project.

On the same day, September 27, 1984, Friends and BAHA filed their petition for writ of mandate and for declaratory and injunctive relief against the County, the Board, the Planning Commission, the County planning department and the County building inspection department; in addition, the petition named as real parties in interest Clark Wallace, Crossroads Associates, and Branagh, Inc., a contractor engaged by Crossroads Associates. In this petition, Friends and BAHA requested a writ of mandate to vacate and set aside the following: the County's issuance of a permit to demolish the Orinda Theatre (Theatre) and the adjoining American Trust Bank Building (Bank Building) on the Project site; the Planning Commission's conditional approval of the Project's development plan and zoning variances;

the Planning Commission's certification of the final environmental impact report (EIR) for the Project; the Board's denial of appeals from the Planning Commission's action; and the Board's certification of the final EIR for the project.

Pursuant to stipulation, the two mandamus actions were ordered consolidated on October 3, 1984. On February 7, 1985, the trial court filed its statement of decision and judgment upholding the actions of the various County agencies, and denying the relief sought by Friends, BAHA and the Association.

## II

The development which Crossroads Associates proposes to build, and which is the subject matter of this litigation, originally consisted of a building complex to be located on a two-acre block in downtown Orinda next to the Highway 24 freeway, and on an adjacent street known as Bryant Way, which was to have been abandoned by the County and purchased by the developer. As initially designed, the complex ranged in height from 1 to 5 stories, with an average elevation of 42 feet instead of the 35 feet mandated by applicable zoning ordinances, and had approximately 114,823 square feet of office, commercial, retail and theatre space. Approximately 59 percent of this area was to be used for commercial office space, 27 percent for so-called retail and service facilities, and the remainder divided between three movie theatres, a community meeting room, and a restaurant/lounge. The Project was designed as a complex of buildings of varying heights articulated as a single unit through connecting passageways, courtyards and landscaping. Originally designed to go up to five stories in height in the office portion directly adjacent to the freeway, the complex also featured two levels of underground parking, street level pedestrian access, a large interior court, a "town square" at the corner of Moraga Way and Brookwood Road, an "arrival plaza" along Brookwood Road near a surface parking lot, large lobby areas, and sloping pitched roofs.

A focus of substantial controversy during hearings before both the Planning Commission and Board was the proposed abandonment of Bryant Way. Less than two weeks before the final public hearing of the Board to consider the Project on August 21, 1984,[1] the developer submitted a redesigned proposal for the Project. This new proposal eliminated Bryant Way from the Project and retained it as a public street; reduced the square footage of

---

[1]Although the Project was discussed at one more meeting of the Board on September 18, 1984, this was only briefly and in the context of voting on the adoption of the findings and conclusions.

the entire Project to just over 108,000 square feet; redistributed throughout the Project some 26,000 square feet of building which the original proposal had situated on Bryant Way; reduced interior courtyard and terrace areas by 10 to 20 percent; eliminated the fifth-floor mezzanine on the Bryant Way side but added a third story on one side of the Project; substantially increased overall Project density as measured by the ratio of floor space to lot area; reduced the average building height by approximately 6 to 12 feet at the highest points, and by approximately 4 feet overall; increased the total amount of building mass above the 35-foot zoning limit; added 3,000 to 4,000 square feet of office space on the ground floor; and reduced retail space by 2,093 square feet while *increasing* office space by 326 square feet overall, for a new ratio of 60 percent office space to 40 percent retail space. Although the height of the complex from the ground level to the eave of the roof varied from 22 to 38 feet, the peak of the roof itself reached the height of 55 feet in most parts of the complex, and the height of the Bryant Way elevation was 64 feet. The tallest point in the complex, the elevator tower, reached 70 feet. In addition, the amount of space in the revised Project identified as "retail" included what Wallace called "quasi-office-retail," such as title companies, real estate and insurance offices, and stock brokerages.

Currently, the Project site is occupied by the Theatre and Bank Building, four other small buildings used for office and retail purposes, and a gas station. Almost half of the area of the site is a surface parking lot.

The Theatre was designed by Alexander Aimwell Cantin (1877-1964). One of California's first registered architects, he was involved in designing several important buildings in San Francisco.[2] It was originally constructed in 1941; the adjoining Bank Building, built in 1947 by the same architect and in the same "Art Deco" or "Moderne" style, forms a unified architectural unit with the Theatre. The tower on the Theatre forms an identifying landmark clearly visible from the Highway 24 freeway. The Theatre is 40 feet high in the front and 45 feet high in the rear; its sign tower is 75 feet in height. With 750 seats, it is the last large, old-style theatre in the County.

---

[2]Cantin collaborated with James R. Miller and Timothy Pfleuger in the design of the San Francisco New Montgomery Street Telephone Building (1925), and designed three other San Francisco buildings: the Pacific States Telephone and Telegraph Building on Bush Street (rated as of "Highest Importance" by the City of San Francisco in terms of architectural quality, historical value, and relationship to the environment) (1905); the Elks Building on Powell Street (1909); and the East Office Telephone & Telegraph Building on Hyde Street (circa 1905). None of these buildings shows the dominant Art Deco design of the Theatre. Cantin also designed the Alhambra Union High School in Martinez, the Rheem Theatre in Moraga, and the Marin Junior College in Kentfield.

The interior of the Theatre is decorated in both the foyer and the auditorium with wall and ceiling murals by Anthony T. Heinsbergen (1895-1981), one of the leading decorative artists of the period. Heinsbergen designed interiors and painted murals for such buildings as the Paramount Theatre in Oakland; the Interstate Commerce and Labor Department Buildings in Washington, D.C.; the Los Angeles City Hall; the Biltmore Hotel in Los Angeles; the Sir Francis Drake Hotel in San Francisco; and the Fox-Wilshire and Pantages Theatres in Hollywood. His work was the subject of an exhibit by the Smithsonian Institution which toured the United States in 1972-1974.

On August 13, 1982, acting on a nomination by Friends and BAHA, the California State Historical Resources Commission voted unanimously to recommend that the Theatre and Bank Building be listed in the National Register of Historic Places. The State Office of Historic Preservation found that the Theatre was "an outstanding example of its genre," with a "re-markable" interior of "high artistic value" and "exceptional quality," and that although the two buildings were less than 50 years old, they were both of "exceptional importance." The properties were subsequently certified by the Department of the Interior as eligible for inclusion on the National Register of Historic Places.[3]

### III

The proposed Project is governed by three levels of applicable local land-use regulations: the Contra Costa County Zoning Ordinance (Zoning Ordinance), the Orinda General Plan (General Plan), and the Orinda Central Business District Design Guidelines (Design Guidelines).

The Zoning Ordinance sets out the basic restrictions on buildings in "community business" (C-B) districts in the County, the procedures for review of development proposals and the standards for granting of variances. Included in the Zoning Ordinance is a provision stating that no building or part thereof may exceed 35 feet above "the average existing natural ground level at the center of all walls of the building."[4]

---

[3]The actual listing has not occurred because the property owner, Crossroads Associates, has resisted inclusion of the buildings on the Register.

[4]The following provisions of the Zoning Ordinance are pertinent to this litigation:

84-49.204: "Purposes. The purposes of this chapter's regulations are to enhance and stabilize the retail sales and personal services activities within central areas and to foster development of ever more attractive, higher quality retail shopping areas, creating more concentrated, easily accessible retail shopping and personal services central areas for the benefit of businesses and consumers alike."

84-49.802: "Maximum Building Height. No building or structure or part of it hereafter erected or moved on a lot or building site in this district shall exceed thirty-five feet above

The General Plan was adopted in October 1972 by the County planning commission and in January 1973 by the Board as a revision of a general plan originally adopted in 1959 for Orinda. It was formulated by the county planning department together with an advisory committee of community and public representatives, including members of the appellant Association. Despite dramatic changes in the Orinda area since 1959, including the completion of the Highway 24 freeway, the opening of the BART system, and the tremendous population growth in the San Francisco Bay Area in general and the County in particular, the General Plan states that "the basic goals of the 1959 Orinda General Plan remain unchanged. The revised plan proposes the continued development of a low density, suburban residential community, including supporting community-oriented services and facilities." The various headings of the General Plan cover such topics as "Land Use, Commercial and Office," "Community Facilities," and "Office Development." The principal themes repeatedly stressed throughout the General Plan are that commercial development in Orinda should be "locally-oriented" as opposed to "regional," compatible with the existing "village character" of Orinda, and "low-line."

Thus, under the heading "Land Use, Commercial and Office," the General Plan states the following relevant guiding principles: "Business development in the Orinda Planning Area should be limited to neighborhood and com-

---

the average existing natural ground level at the center of all walls of the building."

84-50.1606: "Review, approval, changes, conditions. [¶] (a) Review. The zoning administrator shall review development plan applications, for approval, modification, or denial, in public hearing pursuant to and otherwise regulated by the land use permit provisions of Chapter 26-2. [¶] (b) Approval. In approving the application, he shall find that it is consistent with the purpose of this district and that it is architecturally compatible with other uses in the vicinity, both inside and outside the district. [¶] (c) Changes. When any plan has been approved by the zoning administrator, it shall not thereafter be changed except with his approval after review, for which he may schedule a public hearing. [¶] (d) Conditions. The zoning administrator may impose reasonable conditions and limitations in addition to the requirements listed in this article, to carry out the purpose of this district."

26-2.2006: "Variance, conditional use and special permits—Variance permit standards. An application for a variance permit is an application to modify zoning regulations as they pertain to . . . setback, auto parking space, building or structure height, or any other regulation pertaining to the size, dimension, shape or design of a lot, parcel, building or structure, or the placement of a building or structure on a lot or parcel. The division of the planning agency hearing the matter either initially or on appeal shall find the following conditions that must exist prior to approval of an application: [¶] (1) That any variance authorized shall not constitute a grant of special privilege inconsistent with the limitations on other properties in the vicinity and the respective land use district in which the subject property is located; [¶] (2) That because of special circumstances applicable to the subject property because of its size, shape, topography, location or surroundings, the strict application of the respective zoning regulations is found to deprive the subject property of rights enjoyed by other properties in the vicinity and within the identical land use district; [¶] (3) That any variance authorized shall substantially meet the intent and purpose of the respective land use district in which the subject property is located. Failure to so find shall result in a denial."

munity service and retail types. Regional commercial developments should not be permitted. . . . [¶] The central business area should be improved to create better pedestrian orientation and more adequate parking. [¶] A limited amount of locally-oriented new office space should be provided for the central business area that complements existing land uses. [¶] The appearance of the central business area, especially the main entrance to Orinda, should be made more attractive." Similarly, under "Community Design," the General Plan states that future development should be "visually and functionally compatible with the existing character of Orinda," and that development in the business district should be "of 'low-line' architecture and complementary to existing development and terrain."

In the section entitled "Land Use Proposals," under the headings "Commercial and Office Development" and "Community Shopping," the General Plan states that future development in Orinda's central business area—which includes the site proposed for development by Crossroads Associates— should maintain the "distinctive village character that is appropriate to the community," defined as being characterized by a "compact pattern of development, low buildings, heavy tree coverage, narrow pavements, and frequently older structures." Indeed, the General Plan goes so far as to state that "[a]lthough some of these features individually work against the area as a convenient place to park and shop and do business to a degree, the general plan regards the retention of the district's village character as most important . . . ." With regard to the types of businesses to be located in the central Orinda area, the General Plan states that these should be "those which serve the convenience needs of the residents. In keeping with the goals of this plan, it is important that further development in the central area be of the type that is unique and appropriate for Orinda; i.e., those business uses that are of a community nature and cater to local needs."[5]

---

[5]In this regard, the General Plan states that "[t]he existing and future types of commercial uses anticipated by this plan are those local service and retail outlets which will meet the needs of residents of the community. They should primarily serve the everyday needs of the customer, providing for a wider variety of goods and services than the traditional neighborhood shopping center, yet maintain a local orientation. Among the acceptable uses are branch banks, variety stores, clothing stores, grocery stores, restaurants, flower shops, drug stores, and such services as barber and beauty shops, shoe repair, and radio and television repair shops. Large retail commercial uses intended to serve regional or countywide markets should not be developed in these areas. Such uses would seriously alter the character of the commercial district and create unmanageable problems for an area already beset with a severe parking shortage."

On the other hand, under the heading "Office Development," the General Plan acknowledges that "[n]ational trends indicate major corporations are increasingly locating their regional or subregional offices in suburban locations. To some extent, this trend is manifest in Orinda with the consequence that Orinda is developing a small but significant economic base in office activity. [¶] Continued growth in the Orinda Planning Area is expected to create a limited need for expansion of local office uses in the central area. To accomodate [sic] this growth, an expansion of 10 acres of office use within the business district is

Finally, under "Community Facilities," the General Plan states goals of particular relevance to the controversy over the fate of the Theatre and Bank Building: to "obtain maximum benefit from existing public structures and facilities"; to "acquire easily accessible civic, cultural, and recreational facilities large enough to handle present and expected future demand"; and that "structures of historic significance should be preserved wherever possible."

The Design Guidelines are far more detailed than the General Plan. Their stated purpose is to provide "a tool with which to improve the efficiency and quality of life for the occupants and users of the Orinda Central Business District." They establish "[s]pecific design guidelines . . . for future development of new or existing structures."

To this end, the Design Guidelines set forth a large number of specific provisions under the headings "Site Planning" and "Architectural Design," relating to such matters as "location of buildings relative to street access and parking," "parking access," "location of buildings relative to adjacent structures," "outdoor pedestrian spaces," "landscaping," "architectural character and style," "building massing and shape," "building scale" and "form," "building integrity and public visibility," and "color and materials." The overall thrust of the guidelines, repeatedly emphasized under all of these topics, is to preserve the "rural" or "semi-rural" "village character" of Orinda.[6]

proposed by this plan. Basically, the expansion will be accomplished by rezoning current business zoning to an office classification in both the Crossroads and Village areas. Relative to expansion of this type, high-rise and other forms of high intensity development are to be avoided. Future office expansion should be in keeping with the existing character of the community."

[6]Thus, under "Architectural Design," the guidelines state: "Due to the topography of Orinda, the Central Business District is located such that it is viewed from above by much of the community residential area. In order to retain a semi-rural character for future development, it is important to recognize this condition in the future design of buildings in the Central Business District. . . . [¶] . . . There is presently nothing resembling an architectural character or style which could be considered unique or distinctive for Orinda. There are, however, several buildings that exemplify the type of quiet, dignified quality, and informal building type that the Commission believes is the most suitable on which to build an architectural character for the community. These buildings . . . are characterized by several basic features, all of which help to create residential images in a downtown setting to reinforce the transition from a small compact semi-rural business district to surrounding residential neighborhoods. [¶] The indicated buildings all have sloping roofs which conceal mechanical equipment, have wood and/or masonry exterior walls, have visual penetration (i.e. they are interesting and inviting to enter), are of quality construction, and are appropriate for a semi-rural community like Orinda. Although strict adherence to these building types is not suggested, the above enumerated features which make them superior to other buildings in the Central Business District must be noted and incorporated in new applications. The Commission will tend to discourage the artificiality of simulated architectural styles."

Under the heading "Variances," the Guidelines provide: "Variances to the requirements in the zoning ordinance will be considered by the Planning Commission if appropriate findings can be made. [¶] The Commission will encourage the inclusion of significant amounts of open space, landscaping, and buildings of variable height. The provision of parking, at or above ordinance requirements, will help solve neighborhood parking problems, and will be encouraged. Parking below ground level could make a higher density development possible, and the Commission encourages applicants to examine all possibilities early in the planning stage."

## IV

The draft EIR on the Project, consisting of a 115-page report with a separate 125-page "Appendix Supplement," was completed and distributed in or about June 1983. The review period was from July 13, 1983, through August 29, 1983.

The draft EIR made the following pertinent determinations: the height variance sought by the developer would constitute an unjustified "special privilege and would set an adverse precedent"; the large amount of office space in the proposed project would primarily be available to "larger office users not providing locally-oriented services," which would be "inconsistent with General Plan policies calling for limited expansion of office area and locally-oriented offices"; and, "[d]espite many excellent features, the project is a megastructure in concept, with density, building mass, and height which are inconsistent with the General Plan and the . . . Design Guidelines, in terms of 'low-line' architecture, 'village character,' existing neighborhood character, and compatibility with adjacent development." The draft EIR proposed that the Project be redesigned to reduce height, density, mass and large-scale office space in conformance with the Zoning Ordinance and General Plan. In connection with these findings, the Draft EIR stated that the Project as proposed would induce large-scale growth in the Orinda area by setting a precedent for converting the central business district "away from local community services to areawide or regional services"; and that it would significantly and permanently alter the character of the neighborhood, contrary to the goals of the Design Guidelines.

---

Similarly, under "Building Scale," the Design Guidelines state: "Buildings should be designed to be compatible in scale with adjacent structures in the community, and to comply with the intent of the Orinda General Plan: to retain a 'Village Character' scale. The existing 'Village Character' is created by the human scale of development: the compact pattern of development, low buildings, heavy tree coverage, narrow pavements, and many older buildings in the District. Large buildings can be designed to blend with smaller structures by articulating facades, by providing visual penetration to interior spaces and courts, and by the use of overhangs, indentations, arcades, trellises, decks, terraces, etc., to model the exterior."

With regard to the Theatre and Bank Building, the draft EIR found that "there can be no doubt that the Orinda Theatre/American Trust Bank Building complex has important cultural/historic value for the community and in general—value which cannot be replaced by contemporary development. Therefore, removal of these buildings as proposed would result in significant environmental impact." In its discussion of mitigation measures to reduce this environmental impact, the draft EIR identified four possible choices aside from not building the Project: (1) redesigning the Project to retain the Theatre and Bank Building intact and separate from the Project; (2) redesigning the Project by incorporating the Theatre and Bank Building into the Project; (3) redesigning the Project to incorporate the Theatre only, but removing the Bank Building; and (4) preserving certain "fixtures, artifacts, and other interior materials" from the Theatre and Bank Building for display in the Project or elsewhere. The draft EIR recognized that this last mitigation measure "would not be responsive to the overall significant impact of removal of the buildings," and that it was not even clear whether any or all of the interior features of the Theatre could be preserved in view of the nature of the materials used and the expense of removing them.[7] The draft EIR therefore recommended "a study of the cost and potential for preservation of the murals and other interior features" in order to "provide sufficient basic information, based on professional opinion, to assist the Planning Commission and staff in understanding the limitations of this mitigation alternative."

Finally, the draft EIR considered alternatives to the proposed Project, including no project, development in conformance with the General Plan and Zoning Ordinance, and development retaining the Theatre and Bank Building. Included in this section of the draft EIR were drawings and figures showing three alternative project designs: one in the same style as the developer's proposed Project but in conformity with the 35-foot height limitation of the Zoning Ordinance; one retaining and incorporating the Theatre and Bank Building and in the same general architectural style as those buildings; and one submitted by the developer quite similar in design to the proposed Project except that it incorporated the Theatre. The draft EIR noted that both of the alternative project designs retaining the Theatre had heights exceeding the 35-foot limitation; that a design using the Theatre's "art deco" style "might be inconsistent with the standards of the Design

---

[7]The draft EIR noted that "[i]n a letter to the Contra Costa Times, published on September 28, 1982, Mr. A. Y. Heinsbergen, the son of the Orinda Theatre muralist, stated that his father's murals could not be removed from the theatre due to the nature of the materials and the expense that would be involved. This statement may be true, and it may be applicable to most of the other interior features of the theatre. However, it appears that no detailed study has been made to determine exactly what costs and procedures would be required to preserve the various interior materials."

Guidelines''; that the developer's alternative, although saving the Theatre, exhibited the same inconsistencies with the General Plan noted in the proposed Project, including excessive office space for nonlocally oriented businesses and high density; and that any design in which the Theatre is retained would have reduced underground parking and limited options for street-level pedestrian access to the interior of the project.[8]

V

The proposed Project and the draft EIR were discussed in numerous public meetings of the Planning Commission and the Board between July 25, 1983, and September 18, 1984. On February 16, 1984, the Planning Commission voted to certify the EIR, and on May 14, 1984, it gave conditional approval to the Project, including the proposed demolition of the historic buildings. The Findings of the Planning Commission state that all alternatives for preserving the Theatre and Bank Building were infeasible, and that the significant environmental impact would be mitigated by a "detailed study" of the possibility of preserving unspecified interior items in the Theatre. Friends, BAHA, the Association, and Crossroads Associates all appealed various aspects of the Planning Commission's decision to the Board.

The Board conducted a series of hearings on the parties' appeals relating to the Crossroads project. During this period, Crossroads Associates redesigned the project to eliminate the need for abandoning Bryant Way as a public street. The Board did not require preparation of any subsequent or supplemental EIR on this redesign, but simply approved the redesigned Project as presented by the developer at the meeting of August 21, 1984. On September 18, 1984, the Board adopted findings rejecting the various

---

[8]Included in the public comments to the draft EIR was a design proposal submitted in connection with a Friends-sponsored competition for alternative development plans preserving the Theatre. This alternative design proposal was prepared by Steve McKee, who was presented at the Planning Commission meeting of September 26, 1983, as an architectural student who had just completed his Masters Degree at the UCLA Graduate School of Architecture and Urban Planning by submitting a thesis on the retention of the Theatre and Bank Building. McKee's proposal, which included 9 pages of schematic drawings and floor plans, was for a project of 95,000 square feet, with 48,500 square feet used for offices and the remainder used for commercial and retail; between 416 and 475 parking spaces, most underground; and a maximum height of 44 feet for the new buildings. By way of comparison, the developer's proposed Project began as 114,823 square feet, with 67,732 square feet for office space; had an *average* height of 42 feet and a maximum height of up to 70 feet; and 467 parking spaces. The McKee proposal involved "opening up" the Theatre and turning it into a multiple-use facility with a restaurant, terrace, cabaret, two performance stages, pedestrian access, and a skylight. The EIR Responses to Comments, published in February 1984, made no comment on the McKee proposal, except to say "[d]etailed discussion of Mr. McKee's plans is beyond the scope of the EIR."

mitigation proposals of the EIR regarding height, mass, density, and concentration of nonlocal office space, adopting the "study" proposal regarding the possibility of preserving unspecified items in the Theatre and Bank Building, and stating that none of the proposed alternatives was feasible because of the impact on the "unique and desirable" design features of the proposed Project. Thereafter, the parties filed their petitions for writ of mandate.

Prior to the decision of the Board approving the Project, Crossroads Associates obtained a permit from the county building inspection department to proceed with the demolition of the Theatre and Bank Building. The permit was issued without any environmental review or with any reference to the proceedings before the Board or the Planning Commission.

## VI

The Association's petition for writ of mandate is concerned with the alleged conflict between the proposed Project and the applicable land-use regulations. The Association contends generally that the Project approval given by the County Board and Planning Commission, including the height variance, was unlawful.

■ Initially, we note that "in an administrative mandamus action where no limited trial de novo is authorized by law, the trial and appellate courts occupy in essence identical positions with regard to the administrative record, exercising the appellate function of determining whether the record is free from legal error. [Citations.]" (*Honey Springs Homeowners Assn. v. Board of Supervisors* (1984) 157 Cal.App.3d 1122, 1135, fn. 10 [203 Cal.Rptr. 886].) Thus, the conclusions of the superior court, and its disposition of the issues in this case, are not conclusive on appeal. (*Lewin v. St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 387 [146 Cal.Rptr. 892].)

The standard of review in an administrative mandamus proceeding such as this was set forth by the unanimous Supreme Court in the leading case of *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12]. ■ ■ ■ ■ ■ In that case, the Supreme Court held that any administrative grant of a variance must be accompanied by administrative findings; and that a court reviewing such a grant must determine whether substantial evidence supports the findings and whether the findings support the conclusion that all applicable

legislative requirements for a variance have been satisfied.[9] The findings set forth by the agency which renders the challenged decision must "bridge the analytic gap between the raw evidence and ultimate decision or order." (*Id.,* at p. 515.) "Among other functions, a findings requirement serves to conduce the administrative body to draw legally relevant subconclusions supportive of its ultimate decision; the intended effect is to facilitate orderly analysis and minimize the likelihood that the agency will randomly leap from evidence to conclusions. [Citations.] In addition, findings enable the reviewing court to trace and examine the agency's mode of analysis. [Citations.]" (*Id.,* at p. 516, fn. omitted.)

*Topanga* makes it clear that despite the applicability of the substantial evidence rule and the deference due to the administrative findings and decision, judicial review of zoning variances must not be perfunctory or mechanically superficial. "Vigorous and meaningful judicial review facilitates, among other factors, the intended division of decision-making labor [in land-use control]. ■ Whereas the adoption of zoning regulations is a legislative function (Gov. Code, § 65850), the granting of variances is a quasi-judicial, administrative one. [Citations.] If the judiciary were to review grants of variances superficially, administrative boards could subvert this intended decision-making structure. [Citation.] They could '[amend] . . . the zoning code in the guise of a variance' [citation], and render meaningless, applicable state and local legislation prescribing variance requirements. [¶] Moreover, courts must meaningfully review grants of variances in order to protect the interests of those who hold rights in property nearby the parcel for which a variance is sought. A zoning scheme, after all, is similar in some respects to a contract; each party forgoes rights to use its land as it wishes in return for the assurance that the use of neighboring property will be similarly restricted, the rationale being that such mutual restriction can enhance total community welfare. [Citations.] If the interest of these parties in preventing unjustified variance awards for neighboring land is not suf-

[9]"[W]e hold that regardless of whether the local ordinance commands that the variance board set forth findings, that body must render findings sufficient both to enable the parties to determine whether and on what basis they should seek review and, in the event of review, to apprise a reviewing court of the basis for the board's action. We hold further that a reviewing court, before sustaining the grant of a variance, must scrutinize the record and determine whether substantial evidence supports the administrative agency's findings and whether these findings support the agency's decision. In making these determinations, the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at pp. 513-514, fn. omitted.) The Supreme Court based this holding on its interpretation of Code of Civil Procedure section 1094.5, the administrative mandamus provision "which structures the procedure for judicial review of adjudicatory decisions rendered by administrative agencies. . . . Section 1094.5 clearly contemplates that at minimum, the reviewing court must determine both whether substantial evidence supports the administrative agency's findings and whether the findings support the agency's decision." (*Id.,* at pp. 514-515.)

ficiently protected, the consequence will be subversion of the critical reciprocity upon which zoning regulation rests. [¶] Abdication by the judiciary of its responsibility to examine variance board decision-making when called upon to do so could very well lead to such subversion. . . . Vigorous judicial review . . . can serve to mitigate the effects of insufficiently independent decision-making." (*Id.,* at pp. 517-518, fn. omitted.)

██ ██ Thus, this court must determine on the basis of a review of the entire administrative record whether the findings issued in connection with the County's approval of the Project in this case are supported by substantial evidence, whether the findings are in compliance with all statutory and regulatory criteria and requirements, and whether they bridge the analytic gap between the raw evidence and the ultimate decision. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at pp. 515, 518; *Broadway, Laguna etc. Assn.* v. *Board of Permit Appeals* (1967) 66 Cal.2d 767, 772-773 [59 Cal.Rptr. 146, 427 P.2d 810] [findings issued by city and county board of permit appeals in connection with zoning variance did not meet the requirements of the municipal planning code; award of variance was therefore unlawful].)[10]

### VII

The provision of the Zoning Ordinance applicable to the Project at issue states that "[n]o building or structure or *part of it*" erected thereafter shall exceed 35 feet above average existing ground level. (Zoning Ord., art. 84-49.802, italics added.) The grant of variances to owners of property covered by comprehensive zoning plans is governed by Government Code section 65906, which states: "Variances from the terms of the zoning ordinances shall be granted only when, because of special circumstances applicable to the property, including size, shape, topography, location or surroundings, the strict application of the zoning ordinance deprives such property of

---

[10]Although technically no variance was issued on any aspect of the proposed Project other than the excessive height, the same principles apply to this court's review of the approval by the Board and the Planning Commission of any aspects of the Project which are in conflict with applicable land-use regulations, including size, density and use. In the instant case, the proposed Project is in the Orinda C-B District; under the applicable County Zoning Ordinance, it must therefore be consistent with the purpose and intent of, and the restrictions imposed by, the C-B Zoning District, the Orinda General Plan and the Design Guidelines. (Gov. Code, § 65860.) If the local agency could avoid the judicial review mandated by *Topanga* simply by approving a project without any formal grant of a variance, even though the project is not in compliance with the requirements of the applicable regulations governing land use and development, those regulations could be substantially amended or voided simply by ignoring them and approving noncomplying developments. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at pp. 516-518; *Neighborhood Action Group* v. *County of Calaveras* (1984) 156 Cal.App.3d 1176, 1184-1186 [203 Cal.Rptr. 401]; *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 997-999 [165 Cal.Rptr. 514].)

privileges enjoyed by other property in the vicinity and under identical zoning classification. [¶] Any variance granted shall be subject to such conditions as will assure that the adjustment thereby authorized shall not constitute a grant of special privileges inconsistent with the limitations upon other properties in the vicinity and zone in which such property is situated. [¶] A variance shall not be granted for a parcel of property which authorizes a use or activity which is not otherwise expressly authorized by the zone regulation governing the parcel of property. The provisions of this section shall not apply to conditional use permits."

The average height of the Project as originally proposed was 55 feet; as revised, the proposed building height was somewhat lower, with an overall average height of 50 feet. Over 30 percent of the Project's total floor space, or 33,350 square feet, would be located above the 35-foot height limit established by the Zoning Ordinance. A height variance is actually required for virtually every part of the proposed structure.

The Board issued lengthy findings in support of the decisions to approve the Project and to grant the height variance. These findings state that the variance does not constitute the grant of a special privilege because "similar variances" have been granted in the vicinity "based upon the particular design considerations" and "in conformity with the general policy of the County to encourage attractive designs"; the variance is "appropriate" in order "to enable applicants to conform with the . . . Design Guidelines and to create architectural designs meeting the desired aesthetic and design standards of the community"; alternative designs for the Project in conformity with the Zoning Ordinance not requiring any variance "would be unacceptable from an aesthetic and community character standpoint"; the Project site "poses unusual design difficulties primarily because it does not share the semi-rural environment of other parts of Orinda"; due to the "special circumstances and design problems" arising from the Project's "size and proximity to the adjacent freeway," a "strict application" of the applicable zoning regulations "would deprive the subject property of rights enjoyed by other properties in the vicinity," which could conform to the 35-foot height limit "without suffering the adverse affects [*sic*] caused for this site by the freeway, and the variance is necessary to enable this Project site to enjoy the same levels of uses that could be developed in these other areas within the same district while preserving an acceptable design in the public interest"; neighboring properties are screened from the adjacent freeway by this site and will benefit from the "buffering" effect of the building masses of this Project, protecting them against the "noise, exhaust fumes and visual obtrusiveness of the freeway"; "[t]he variance granted will substantially meet the intent and purpose" of the zoning district, which is "to enhance and stabilize" existing retail sales and personal services

activities within central areas, and to "foster development of even more attractive, higher quality retail shopping areas" that are more concentrated and easily accessible; and the Project "enhances the visual quality, convenience and diversity of local business establishments and replaces a large . . . block which is primarily devoted to paved parking areas and outdated structures with a carefully integrated mixed-use Project . . . in keeping with the overall village character of the Project vicinity."

Significantly, the Board found that the 35-foot height limitation imposed by the Zoning Ordinance "is not the predominant purpose of the C-B district and that the primary concern [of the applicable land-use regulations] is the acceptability of design and orientation of projects to the surrounding area. . . . The dominant purpose of the C-B district is not to impose narrow and unsuitable height/bulk/density limitations but to encourage retail and office enhancement and distinguished architecture of the nature embodied in the Project as approved." The Board specifically found that although the height variance enables portions of the proposed Project to exceed an *average* height of 35 feet above grade, and to reach a height of 64 feet, "the proper interpretation of the height limitation is to allow interior portions of the structure to exceed an average height of 35 feet measured at the midpoint of exterior walls and that the variance granted is not the equivalent of a 25-foot height variance. . . . [A] project conforming to the zoning height limitation . . . and other standards with the same or greater intensity of use and square footage could be accommodated on the site, at the expense of providing an attractive design and configuration. The Project, as approved, is compatible with the scale of surrounding uses through the use of appropriate roof treatments, articulated structures, open courtyards and terrace designs incorporated into the approved design . . . and the revised design under which the Board has affirmed the granting of the variance."

In sum, the Board found that the design of the Project was so attractive and had so many perceived compensating benefits, that it was positively good for the height, mass and density of the Project to exceed the express limitations set by applicable land-use regulations. In the Board's own words, "[a]lthough the overall height and bulk of the Project is substantial, . . . [t]he height variance, as granted, allows for a design which improves the attractiveness, comfort and convenience of the Project both to its office users and its retail customers."

 Echoing these findings, respondents' central argument to this court is that the Design Guidelines set forth a more flexible standard for granting variances in order to encourage the development of projects with significant amounts of open space, landscaping, and buildings of variable height; that

the Design Guidelines therefore modify the stricter variance standards and height limitations of the Zoning Ordinance; that the articulated structure and courtyards provided by the proposed Project meet the goals and standards of the Design Guidelines; that a handsome Project could not be designed within the limits set by the Zoning Ordinance; and that the height variance for the proposed Project is justifiable on this basis. However, there is absolutely nothing in the Design Guidelines to suggest that buildings anywhere near as high as those proposed for this Project—up to nearly 70 feet in height, or twice the height of the limits imposed by the Zoning Ordinance—would be in compliance with *other* express goals and standards, such as preservation of a "semi-rural" or "village character" and compatibility of scale with existing adjacent structures. Neither is there any indication in the Design Guidelines that buildings within the 35-foot height limit could not easily meet its stated design goals and aesthetic standards. Indeed, the very opposite conclusion is suggested by the illustrative drawings included in the Design Guidelines and the examples of desirable existing buildings cited therein.

█ In the absence of a specific "bonus" or "merit" system of zoning enacted by the municipal or county legislature, a variance applicant may not earn immunity from one code provision merely by overcompliance with others. Otherwise, the board charged with reviewing development proposals "would then be empowered to decide which code provisions to enforce in any given case; that power does not properly repose in any administrative tribunal.[12]" (*Broadway, Laguna etc. Assn.* v. *Board of Permit Appeals, supra,* 66 Cal.2d at p. 779.) The Supreme Court's footnote 12 adds: "Discretionary power to disregard a basic planning code regulation whenever the board believes that the objectives of that regulation have been fulfilled in a particular building would probably prove impossible to control and might well undermine the entire zoning plan. . . ." (*Id.,* at pp. 779-780, fn. 12.)

█ The Board's findings attempt to address the three conditions which, under the Zoning Ordinance, must be met before a variance may be granted: first, the absence of any "special privilege" inconsistent with the limitations imposed on other properties in the vicinity; second, the existence of "special circumstances" because of which the strict application of the zoning regulations would deprive the subject property of rights enjoyed by other properties in the vicinity; and third, the compliance of any authorized variance with the "intent and purpose" of the applicable land-use district. (Zoning Ord., art. 26-2.2006.) These conditions are derived directly from the language of Government Code section 65906. However, under *Topanga,* the Board's findings must include *facts* sufficient to show that these three

conditions have been met. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at 515, 518-522.)

■ Moreover, the language of both the Zoning Ordinance and Government Code section 65906 "emphasizes *disparities* between properties, not treatment of the subject property's characteristics in the abstract. [Citations.] It also contemplates that at best, only a small fraction of any one zone can qualify for a variance. [Citation.]" (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at p. 520, original italics.)
■ The facts set forth in the required findings must address "the critical issue whether a variance was necessary to bring the [owner of the subject parcel] into substantial parity with other parties holding property interests in the zone. [Citation.]" (*Id.,* at pp. 520-521.) Thus, data focusing on the qualities of the property and Project for which the variance is sought, the desirability of the proposed development, the attractiveness of its design, the benefits to the community, or the economic difficulties of developing the property in conformance with the zoning regulations, lack legal significance and are simply irrelevant to the controlling issue of whether strict application of zoning rules would prevent the would-be developer from utilizing his or her property to the same extent as other property owners in the same zoning district. (*Ibid.*; *Broadway, Laguna etc. Assn.* v. *Board of Permit Appeals, supra,* 66 Cal.2d at pp. 773-781.)

■ It is apparent that the Board's findings in this case primarily deal with desirable project design, amenities, benefits to the community, and the alleged superiority of the proposed Project design to ones developed in conformity with zoning regulations, rather than with presenting the required comparative information about surrounding properties. The findings state that "height and other similar variances" have been granted "on several occasions" in the past on property in the Project vicinity based upon "design considerations"; however, no specific examples are provided.[11]

The only discussion in the Board's findings which actually addresses the substance of the "special circumstances" requirement relates to the greater proximity of the Project site to the freeway in comparison with other parcels in the central business district of Orinda. Although the findings state that "[p]rotection against the noise, exhaust fumes and visual obtrusiveness of the freeway cannot be accomplished effectively with vegetation," there is no affirmative showing whatsoever that the proposed Project's height of between 50 and 70 feet is necessary to provide an adequate "buffer" against

---

[11]In fact, the evidence in the record regarding variances granted to other properties in the vicinity indicates that *every* previous request for a variance from the 35-foot height limitation has been denied, and that the only buildings higher are either in different zoning areas with more liberal regulations or were built before the creation of the C-B district.

the asserted noise, exhaust fumes and visual impact of the freeway, or that a 35-foot building would not adequately provide any desired buffering.[12]

Most important, there is no showing that *any* buffering at all is necessary to permit the owners of *this* property to enjoy privileges enjoyed by *other property* in the vicinity. ▮▮▮ This is the showing required by law; all the findings with respect to this Project's perceived desirability are actually irrelevant and superfluous. (Gov. Code, § 65906.) "Speculation about neighboring land . . . will not support the award of a variance. The party seeking the variance must shoulder the burden of demonstrating before the zoning agency that the subject property satisfies the requirements therefor. [Citation.]" (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at p. 521.) The respondent developer failed to carry this burden.

▮▮▮ In sum, the findings of the Board fail to support the conclusion that all applicable legislative requirements for a height variance have been satisfied. Since there has been no affirmative showing that the subject property differs substantially and in relevant aspects from other parcels in the applicable zone, we conclude that the variance granted by the Board amounts to the kind of "special privilege" explicitly prohibited by Government Code section 65906. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at p. 522.)

### VIII

The Association argues that the proposed Project is in violation of the provisions of the Zoning Ordinance and the General Plan requiring "low density," "semi-rural," "village character," "neighborhood and community service and retail" outlets, and a "limited amount of locally-oriented" office space which "complements existing land uses." They point to the size of the proposed development, which is, at approximately 108,000 square feet, the largest ever proposed for Orinda; the fact that 60 percent of the Project is designated office space and only 40 percent for "retail"; the large-scale, regional orientation of the office space; the developer's expressed

---

[12]To the contrary, the uncontroverted evidence in the record establishes that a 35-foot building would block the visual impact of the freeway; a building higher than 35 feet would have no more noticeable noise abatement impact than a building only 35 feet in height; the completed Project would create more noise in the surrounding area than now exists without any "buffering"; increased automobile traffic generated by the scale of the Project itself would have a greater impact on undesirable fumes and decreased air quality in the vicinity than now exists, even with the freeway; and existing businesses adjacent to the freeway near the Project site have operated successfully for many years despite the absence of the alleged "buffering" provided by buildings over 35 feet in height, and would be more threatened by the increased congestion created by the size of the proposed development.

intention to use the "retail" space in the Project for large, commercial firms in the title insurance, real estate and stock brokerage fields rather than the locally oriented community services listed on the General Plan; and the high density of the Project, with twice the average floor space/lot area ratio in the district and three times the average occupancy rate.

Indeed, the draft EIR made express findings that numerous aspects of the Project—including height, large-scale regionally oriented office space, density, building mass, scale, inconsistency with the existing local retail and service orientation of the community, and growth-inducing impact—were in violation of applicable land-use regulations, and that these violations constituted "significant environmental impacts." As required by CEQA, the draft EIR went on to suggest mitigation measures to reduce these impacts, and various alternatives to the proposed Project. (Pub. Resources Code, §§ 21000, 21002, 21002.1, 21081, 21151.) The Association contends that the Board's findings are legally insufficient to support the Project approval because they fail to carry the burden, mandated by CEQA, of affirmatively showing that the EIR-identified means of mitigating or avoiding the Project's significant environmental impacts are "infeasible." (Pub. Resources Code, §§ 21002, 21002.1, subd. (b), 21081; *Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 263, fn. 8 [104 Cal.Rptr. 761, 502 P.2d 1049]; *San Bernardino Valley Audubon Society, Inc. v. County of San Bernardino* (1984) 155 Cal.App.3d 738, 749-753 [202 Cal.Rptr. 423]; *Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1032-1035 [185 Cal.Rptr. 41].)

In view of our conclusion that the Board's findings are legally inadequate in that they fail to bridge the "analytic gap" between the factual evidence and the ultimate decision granting a height variance, we need not address these issues. The impact of our decision is essentially to send the entire Project "back to the drawing board," unless, as is presumably conceivable, the governmental agency currently charged with reviewing this Project is able to produce entirely new findings in support of the granting of this same height variance, which do not suffer from the inadequacies and failings of the Board's findings reviewed here. We note, however, that in any further review of this Project or possible redesign thereof, the responsible agency must strictly observe the principles established by *Topanga Assn. for a Scenic Community v. County of Los Angeles, supra,* 11 Cal.3d 506. In short, it may not effectively amend the Zoning Ordinance or the General Plan either in the guise of granting a variance, or by approving a nonconforming development on the basis of inadequate findings. Similarly, the responsible reviewing agency must observe the established policy of this state, as enunciated by CEQA and the case law interpreting it, that "public agencies should not approve projects as proposed if there are feasible alternatives or

feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . ." (Pub. Resources Code, § 21002); that "[e]ach public agency shall mitigate or avoid the significant effects on the environment of projects it approves or carries out whenever it is feasible to do so" (Pub. Resources Code, § 21002.1, subd. (b)); and that if a proposed project is adjudged to have a "significant environmental impact," the agency certifying the EIR and approving the project must either adopt one or more of the mitigating measures or project alternatives set forth in the EIR, recommend that another agency with primary jurisdiction adopt such mitigating measures, or else make factual findings showing that specific economic, social or other considerations make the mitigation measures or project alternatives identified in the EIR not "feasible." (Pub. Resources Code, § 21081; Cal. Admin. Code, tit. 14, § 15091.)[13]

## IX

The Association contends that it is entitled to an award of attorneys' fees pursuant to Code of Civil Procedure section 1021.5.[14]

 It has been held that an award of attorneys' fees under the cited statute is appropriate where a party is successful in challenging administrative actions of government entities on grounds of failure to comply with

---

[13]*Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at p. 263, fn. 8 ["[M]itigation measures and alternatives to the proposed action [must] be considered. Obviously if the adverse consequences to the environment can be mitigated, or if feasible alternatives are available, the proposed activity, such as the issuance of a permit, should not be approved . . . ."]; *San Bernardino Valley Audubon Society, Inc.* v. *County of San Bernardino, supra,* 155 Cal.App.3d at pp. 749-753 ["the Board is required . . . to identify project alternatives contained in the EIR as feasible or infeasible. Further, the Board must state *why* the alternative is infeasible. [Citation.]" (*Id.,* at p. 753.)]; *Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors, supra,* 134 Cal.App.3d at pp. 1032-1035 ["Having not made changes or alterations in the project *to avoid or mitigate the listed* significant environmental effects, the board was required by CEQA to find that some consideration made 'the mitigation measures or project alternatives identified in the' EIR infeasible. [Citation.]" (*Id.,* at p. 1034.)] "Thus, when a project is approved that will significantly affect the environment, CEQA places the burden on the approving agency to affirmatively show that it has considered the identified means of lessening or avoiding the project's *significant effects and to explain its decision allowing those adverse changes to* occur." (*Id.,* at p. 1035.)

[14]Code of Civil Procedure section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

CEQA. (*Starbird* v. *County of San Benito* (1981) 122 Cal.App.3d 657, 665 [176 Cal.Rptr. 149].) Respondents contend that no significant benefit will be conferred on the public in this case because the issues here are primarily ones of statutory construction, and the appellants are assertedly motivated solely by narrow private motivations.

We conclude that the proper procedure in this instance is to remand this case to allow the trial court to determine the issues of whether a significant benefit has been conferred on the public and whether there has been any financial burden on appellant Association, and to exercise its discretion under the statute to make the attorneys' fees award decision. (*Mira Monte Homeowners Assn.* v. *County of Ventura* (1985) 165 Cal.App.3d 357, 366 [212 Cal.Rptr. 127]; *Twain Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664, 706 [188 Cal.Rptr. 233].)

## X

We now turn to the appeal by Friends and BAHA in the companion case. In contrast to the litigation addressed thus far, this appeal is concerned not with the Project in general or as a whole, but quite specifically with the fate of the Theatre and Bank Building. Appellants Friends and BAHA raise numerous issues with respect to the removal of the Theatre and Bank Building, including the adequacy of the EIR's evaluation of Project alternatives and mitigation measures, the adequacy of the EIR's response to public comments and proposals, the adequacy of the Board's findings, and whether a supplemental EIR was required by the developer's redesign of the Project. Once again, in view of our finding in the Association's case that the Project itself is invalid because of its violation of the Zoning Ordinance and the Board's failure to support and justify its approval of the Project in light of this noncompliance with applicable land-use regulations, we need not address these questions.[15]

One argument of appellants Friends and BAHA is not mooted by our decisions in the Association case, however. They contend that the

---

[15]Our decision in this case requires the developer and the responsible reviewing agency to start afresh, either with a new examination of the existing Project proposal, or else with an entirely new project. In either case, future proceedings must of course be in strict compliance with the considerations addressed in this opinion, all applicable land-use regulations, CEQA and the case law interpreting it. If a new or redesigned Project is proposed, it may well require the preparation of a new or supplemental EIR. (Pub. Resources Code, § 21166; Cal. Admin. Code, tit. 14, §§ 15162-15164; *Mira Monte Homeowners Assn.* v. *County of Ventura, supra,* 165 Cal.App.3d 357, 365; *Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1024-1025 [192 Cal.Rptr. 325]; *Stevens* v. *City of Glendale* (1981) 125 Cal.App.3d 986, 998-999 [178 Cal.Rptr. 367]; *County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 192-200 [139 Cal.Rptr. 396].)

building inspection department's issuance, without any environmental review, of an unqualified permit for demolition of the Theatre and Bank Building was in violation of CEQA. The building inspection department issued the unconditional demolition permit on August 24, 1984, upon the developer's application. This was only three days after the public hearing of the Board at which Crossroads Associates unveiled its redesign of the Project, and three weeks *before* September 18, 1984, the day on which the Board completed its CEQA review, certified the final EIR and approved the Project subject to the condition that a study be made of the feasibility of preserving interior artifacts from the Theatre and Bank Building.

Appellants' attack on the demolition permit rests on their contention that demolition was a phase of the overall Project; as such, it was subject to the same CEQA review as the rest of the Project, and the demolition permit could not be issued until the entire CEQA process was completed and the overall Project lawfully approved. We agree with this contention.

Under the Administrative Code, "'Project' means the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately . . . ." (Cal. Admin. Code, tit. 14, § 15378, subd. (a).) No agency may approve a project subject to CEQA until the entire CEQA process is completed and the overall project is lawfully approved. This includes an initial determination by the responsible agency as to whether an EIR is required on the project or any part thereof. ▮ "First, because an EIR serves to guide an agency in deciding whether to approve or disapprove a proposed project, CEQA impliedly requires (and the guidelines expressly require) that the agency render a written determination whether a project requires an EIR before it gives final approval to that project. . . . [¶] Second, since the preparation of an EIR is the key to environmental protection under CEQA, accomplishment of the high objectives of that act requires the preparation of an EIR whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66]; see also *Friends of "B" Street* v. *City of Hayward, supra,* 106 Cal.App.3d 988, 999-1004.)

▮ A public agency is not permitted to subdivide a single project into smaller individual subprojects in order to avoid the responsibility of considering the environmental impact of the project as a whole. "The requirements of CEQA, 'cannot be avoided by chopping up proposed projects into bite-size pieces which, individually considered, might be found to have no significant effect on the environment or to be only ministerial.' [Citation.]" (*Topanga Beach Renters Assn.* v. *Department of General Services* (1976) 58 Cal.App.3d 188, 195-196 [129 Cal.Rptr. 739].) ▮ "[T]he term 'project,' . . . means the *whole of an action* which has a potential for

physical impact on the environment, and . . . '[t]he term *"project" refers to the underlying activity and not the governmental approval process.'* [Citation.]" (*Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959, 969 [131 Cal.Rptr. 172], italics added by the *Natural Resources* court.) "It is, of course, too late to argue for a grudging, miserly reading of CEQA. . . . [T]he Legislature intended CEQA 'to be interpreted in such manner as to afford the *fullest possible protection* to the environment within the reasonable scope of the statutory language.' (Italics added.) . . . [¶] One . . . overwhelming consideration which militates against deferring the preparation and consideration of an EIR . . . is the mandate of CEQA that environmental considerations do not become submerged by chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences." (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 274, 283-284 [118 Cal.Rptr. 249, 529 P.2d 1017].)

The administrative record shows that from the outset, the demolition of the Theatre and Bank Building was considered *part* of the Project under consideration. The findings of both the Board and the Planning Commission begin by describing the "Project" under review as "involving the removal of existing improvements *and* construction of a . . . building complex . . . ." (Italics added.) Both sets of findings describe the Project as a "single Project" for purposes of CEQA, and the draft EIR described demolition of the subject buildings as one of the Project's significant environmental impacts. Most important, both the Board and the Planning Commission imposed *conditions* on the demolition of the Theatre and Bank Building as part of their approval of the Project. Crossroads Associates obviously does not propose demolition of the Theatre and Bank Building as an end in itself, but as part of its larger proposed Project. If demolition could be segregated from other development activities and made nonreviewable, the requirements of CEQA would be avoided altogether, and the statute would have no effect on the one development activity most threatening to an arguably important historic resource.

In view of this conclusion, we need not address the question of whether the issuance of the demolition permit by itself was actually a discretionary or mixed discretionary-ministerial act, subject as such to CEQA review separate and apart from the rest of the Project.[16]

---

[16]On March 18, 1986, one day before the date for oral argument on these appeals, appellants Friends and BAHA submitted an ex parte request that we take judicial notice of a resolution of the Orinda City Council relating to a recent submission by the developer in this case of a new design for the Project. As was made clear by a letter from counsel for respondents and in oral argument, this new submission by the developer was part of ongoing settlement negotiations between the parties. As such, it was inappropriate for this matter to be placed before us, and we will not take judicial notice thereof.

The judgment denying appellants' petitions for mandate is reversed, and the cause is remanded with directions to the superior court to issue a writ of mandate requiring the Board and the Planning Commission to vacate and set aside their approval of the development plan and zoning variances for the proposed Project, and a writ of mandate requiring the County building inspection department and any other agencies involved to vacate and set aside the issuance of the permit to demolish the Theatre and Bank Building. The superior court shall exercise its discretion under Code of Civil Procedure section 1021.5 with respect to an award of attorneys' fees to the Association.

White, P. J., and Barry-Deal, J., concurred.