[No. B008181. Second Dist., Div. Six. Mar. 7, 1985.]

MIRA MONTE HOMEOWNERS ASSOCIATION et al.,
Plaintiffs and Appellants, v.
COUNTY OF VENTURA, Defendant and Respondent;
EUGENE WEBB et al., Real Parties in Interest and Respondents.

358

COUNSEL

Chase Mellen III and Philip A. Seymour for Plaintiffs and Appellants.

No appearance for Defendant and Respondent.

Nielson & Wedding, Lindsay F. Nielson and Jo Ann M. Wedding for Real Parties in Interest and Respondents.

OPINION

ABBE, J.—Mira Monte Homeowners Association and Craig Brainard appeal from a judgment denying their petition for writ of mandate. Appellants seek to compel respondent "County of Ventura, by and through its Board of Supervisors" to set aside its certification of an environmental impact report (EIR) and its associated tentative tract map approval for failing to prepare a subsequent or supplemental EIR as required by the California Environmental Quality Act (CEQA)[1] They further seek to prevent respondent and the real parties in interest, Eugene Webb and Richard McGee (the developers), from carrying out the project until CEQA's requirements are met. This court issued a temporary stay order staying the Board's approval of tentative tract map No. 3720 pending final disposition of this appeal.

We reverse the judgment.

FACTS

The proposed project which is the subject of this appeal involves the subdivision of a 22.89-acre tract into residential lots and construction of modular homes. The site contains a fragile wetland area and vernal pool, which is a small hardpan-floored depression that fills with water during the winter and engenders plant growth as it dries. It is the location of rare plant species endemic to that habitat.

[1] Public Resources Code section 21000 et seq. All further statutory references are to the Public Resources Code, unless otherwise specified.

The County of Ventura (County), the lead agency,[2] determined that the project might have a significant effect on the environment. This determination necessitated preparation of an EIR and performance of an environmental review. (§ 21151; State CEQA Guidelines (Guidelines)[3] §§ 15064, 15081.) By law, an EIR must identify and examine the following: significant environmental effects of a proposed project, feasible mitigation measures, unavoidable significant effects, significant irreversible environmental changes, and alternatives to the proposed action. (§§ 21061, 21100; Guidelines, § 15126.) The review process involves preparation of a draft EIR, consultation with other public agencies, public review of the draft, and evaluation of and response to comments received. (§§ 21153, 21080.3, 21080.4, 21092; Guidelines, §§ 15081-15088.)

Early in the environmental review process, the County learned that the project as proposed placed a number of lots within or directly adjacent to the area identified as wetlands. Thereafter, the project was revised to eliminate the encroaching lots and the County's review continued on the assumption that the development would not physically invade the wetland area.[4]

Before approving the project, the County was required to certify that a final EIR[5] had been completed in compliance with CEQA and that the decisionmaking body had reviewed and considered the document. (§ 21151; Guidelines, § 15090.) Also prior to project approval, the County was required to make findings that it had, to the extent of its jurisdiction and authority, imposed changes or alterations in the project which would avoid or substantially lessen the significant effects identified in the EIR or that the unmitigated significant effects were outweighed by the project's benefits. (§§ 21081, 21002, 21002.1; Guidelines, §§ 15091-15093.)

On January 20, 1984, four days prior to a hearing held by the board of supervisors (Board) regarding EIR certification and approval of the associated tentative tract map, County staff discovered, through a resurvey of the

---

[2]The lead agency is the public agency with principal responsibility for carrying out or approving a project which may have a significant effect upon the environment. (§ 21067.)

[3]California Administrative Code, title 14, section 15000 et seq.

[4]Although a map contained in the EIR showed the southeast edge of "E" Street infringing slightly upon the wetlands, its text informed that the wetland area "is proposed to remain undeveloped" and "[t]he development . . . has been designed to prevent encroachment upon this area."

[5]A final EIR consists of the draft EIR, comments and recommendations received through consultation with other public agencies and public review, a list of commenting entities, written responses by the lead agency, and any additional information included. (Guidelines, § 15132.)

project site, a previously unidentified encroachment upon the wetlands.[6] At the Board's January 24, 1984 hearing, the County conservationist testified regarding the resurvey: "We did, in fact, find that E Street does protrude into this wetland more than we had identified when we first reviewed the EIR. . . ." The encroachment was approximately a quarter of an acre greater than previously thought. He attributed the discrepancy to the fact that a vernal pool fills during the winter and then gradually dries. The study was conducted during the summer months. The conservationist further testified: "So, in the field, the applicant agreed to excavate other areas just east of E Street there, down to a level which would promote, hopefully, a vernal pool situation. We have no guarantee that that's going to occur."

A staff planner testified that additional conditions of tentative tract map approval, which had been developed since the discovery of the encroachment for the purpose of mitigating that impact, were being recommended to the Board. These new conditions required the developers to excavate an area adjacent to "E" Street to create a vernal pool habitat and submit a wetland management plan for the wetland preservation area east of "E" Street.

Also testifying at the Board's hearing on behalf of appellants was a senior museum scientist from the University of California at Santa Barbara. He explained that the vernal pool habitat, which was sensitive to environmental alterations, currently occurred on both sides of the proposed road. He further stated that 22 rare plant species, not all mentioned in the EIR, occurred at the project site. One species, he claimed, was last reported in the location of the proposed road. Representatives from the California Native Plant Society and the Sierra Club concurred with his testimony.

Following the hearing, the Board certified the EIR as complete and conditionally approved the tentative tract map. It also adopted the planning commission's findings that the significant effects of the project, with the exception of two impacts not here relevant, had been eliminated or adequately mitigated by the present design of the tentative map and the conditions of approval, which included the newly formulated conditions.

---

[6]On January 12, 1984, the County planning commission reviewed the final EIR for the project, the revised tentative tract map, and an application for a planned development permit. An issue arose regarding the possible encroachment of "E" Street upon the wetlands. The commission requested staff to provide the board of supervisors with additional data. The commission tentatively approved planned development permit No. 959 and passed a resolution recommending that the Board certify as complete the final EIR, adopt a statement of overriding considerations regarding remaining unmitigated effects, and approve the tentative tract map subject to the conditions formulated by staff. The condition for approval incorporated the measures recommended by the EIR for mitigation of the project's impact upon the wetlands.

The County filed a notice of determination regarding its project approval on January 30, 1984. (§ 21152, Guidelines, § 15094.) A petition for writ of administrative mandamus was filed on February 29, 1984. (§ 21167.)

## DISCUSSION

The issue before us is whether the Ventura County Board of Supervisors abused its discretion under CEQA by certifying the EIR under consideration as complete and granting approval of tentative tract map No. 3720 without first preparing a subsequent or supplemental EIR. Abuse of discretion is established if the Board did not proceed as required by law, if its determination was not supported by its findings, or its findings were not supported by substantial evidence. (§ 21168; Code Civ. Proc., § 1094.5, subd. (b).)

### Adequacy of the EIR

Appellants contend that the EIR as certified is inadequate in that it fails to identify the environmental effects of the newly discovered encroachment or discuss feasible mitigation measures. They further assert that the County was required to prepare a subsequent or supplemental EIR in the face of this discovery. Real parties in interest counter that the significant adverse impact of the project's encroachment upon the wetlands and endemic plant populations was adequately identified and addressed in the EIR. They claim that "there was no need to isolate the issue of the E Street encroachment from the broader issue . . . of encroachment of the project." They further argue that the Board made the necessary findings regarding mitigation of the significant effects and their findings were supported by substantial evidence.

Once an environmental impact report has been properly prepared for a project, CEQA requires a subsequent EIR only where "one or more of the following events occur: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (§ 21166.)[7] If any of these events occur prior to project approval, a subsequent EIR must be

---

[7] A supplement to an EIR may be prepared instead of a subsequent EIR if "only minor additions or changes would be necessary to make the previous EIR adequately apply to the project in the changed situation." However, a supplement to an EIR must be given the same kind of notice and public review given to a draft EIR. (Guidelines, § 15163.)

prepared before approval is granted. (Guidelines, § 15162, subd. (b).) Preparation of an additional EIR involves the same environmental review process applicable to an initial EIR.

Our inquiry focuses on whether the newly discovered "E" Street encroachment involves a substantial change in circumstances within the meaning of section 21166, since no changes in the project were proposed and the new information was available at the time the EIR was certified. Guidelines section 15162 directs that an additional EIR be prepared where ". . . [s]ubstantial changes occur with respect to the circumstances under which the project is undertaken, such as a substantial deterioration in the air quality where the project will be located, which will require important revisions in the previous EIR . . . due to the involvement of new significant environmental impacts not covered in a previous EIR. . . ."

" 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (§ 21068.) The CEQA Guidelines require a mandatory finding of significance where, inter alia, the project ". . . has the potential to . . . threaten to eliminate a plant or animal community, [or] reduce the number or restrict the range of a rare or endangered plant. . . ." (Guidelines, § 15065.)[8] The Guidelines further provide that a project will normally have a significant effect on the environment if it will substantially affect a rare or endangered species of plant or its habitat or substantially diminish habitat for fish, wildlife, or plants. (Guidelines, appen. G.)

The ecological importance of the wetlands, both as a scarce habitat and the location of rare plant species, was established previous to the Board's hearing. During June of 1982, a flora-fauna survey of the site was conducted on behalf of the County. The study advised that the wetlands were "one of the last, if not the only remaining habitat types of its kind" and identified five rare plant species endemic to the area.

Thereafter, during the preliminary stages of the environmental review process, the County consulted with the California Department of Fish and Game[9] and was advised that the proposed project would adversely impact

---

[8]CEQA requires the establishment of implementing guidelines, which include criteria for determining what constitutes a significant effect on the environment. (§ 21083.)

[9]The California Department of Fish and Game is a trustee agency with regard to designated rare or endangered native plants. "Trustee agency" is a state agency having jurisdiction by law over natural resources which are held in trust for the people of the State of California and are affected by a project. (Guidelines, § 15386; see Fish & G. Code, § 1750 et seq. (Native Species Conservation and Conservation Act), § 1900 et seq. (Native Plant Protection), § 2050 et seq. (Cal. Endangered Species Act).) The County was required to consult with all trustee agencies responsible for resources affected by the project during the environmental review process. (§§ 21080.3, 21080.4, 21153; Guidelines, §§ 15063, subd. (g), 15086.)

the wetlands and that the filling of wetlands conflicted with California's wetlands protection policy. The "policy for preservation of wetlands in perpetuity" promulgated by the State Resources Agency provides: "It is the basic policy of the Resources Agency that this Agency and its Departments, Boards and Commissions will *not* authorize or approve projects that fill or otherwise harm or destroy coastal, estuarine, or inland wetlands." (See Final EIR, State Clearinghouse #83013050, appen. D.) The department recommended that the scope of the project be reduced to avoid damage to the sensitive biological resources. The tentative tract map originally filed was revised to eliminate the encroaching lots.

The EIR proposed several mitigation measures intended to reduce the project's impact on the identified wetland area. These actions involved construction of a fence along the wetland's perimeter, preservation of the rear portion of the adjoining park in its natural state, and prohibition of development within the alteration of the wetland area and rear portion of the park through covenants, conditions and restrictions. The EIR indicated that implementation of all measures would fully mitigate the impact upon the wetland habitat.

The discovery that "E" Street would pave over part of the wetlands was a change in circumstances. It meant that the significant impact upon the wetlands would be more severe than previously recognized by the EIR. By definition, that unaddressed encroachment involved a new significant effect because it eliminated a portion of the wetlands thereby restricting the range of a rare or endangered plant. (See Guidelines, § 15065.)[10] Moreover, the wetland habitat had been recognized by the state as a diminishing resource needing special protection. Impliedly, County planners recognized a new significant effect when they hurriedly drafted and recommended imposition of the additional conditions. The Board necessarily adopted this staff analysis when it approved tentative tract map number 3720 subject to those very conditions.

Section 21166 and the implementing guidelines dictate that the proper procedure upon discovery of the encroachment should have been further

---

[10]Appellants also argue that the testimony adduced at the Board's hearing regarding existence of previously unidentified rare plant species required a finding of significance. Real parties in interest assert that the discrepancy is merely a disagreement between experts which does not affect the adequacy of the EIR. Since a finding of significance is required if the range of *a* rare or endangered plant is restricted, the information merely affects the magnitude of the impact. A subsequent or supplemental EIR must examine the affected plant populations as part of its evaluation of the environmental impact. Furthermore, even if experts disagree regarding whether certain plant species qualify as "rare" or "endangered" (see Guidelines, § 15380), an EIR should disclose and summarize the disagreement. (Guidelines, § 15151.)

environmental evaluation by way of a subsequent or supplemental report prior to any project approval. By failing to act in this manner, the County did not consider the full range and effectiveness of alternatives and mitigation measures. The Board's imposition of the additional conditions and its administrative findings regarding mitigation did not cure the County's failure to proceed as required by law. This is true even if the Board would have reached the identical findings and determination had it been in compliance. (*Rural Land Owners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1022-1023 [192 Cal.Rptr. 325].)

The value of an EIR is as an informational document. (§ 21061; Guidelines, § 15121, subd. (a).) It is ". . . the 'heart' of CEQA [citation], the principal method by which environmental data are brought to the attention of the agency and the public." (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 84 [118 Cal.Rptr. 34, 529 P.2d 66].) "The report. . . . may be viewed as an environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return." (*County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].) "One of its major functions . . . is to ensure that all reasonable alternatives to proposed projects are thoroughly assessed . . . ." (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 197 [132 Cal.Rptr. 377, 553 P.2d 537].)

Furthermore, the failure to prepare a subsequent or supplemental EIR deprived the public, who relied on the EIR's representations, of meaningful participation regarding the issue of wetland degradation. ■ "In reviewing an EIR a paramount consideration is the right of the public to be informed in such a way that it can intelligently weigh the environmental consequences of any contemplated action and have an appropriate voice in the formulation of any decision." (*Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 804 [161 Cal.Rptr. 260].) "Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance. . . ." (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 192-193 [139 Cal.Rptr. 396].) ■ "[A]n accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR. The defined project and not some different project must be the EIR's bona fide subject." (*Id.*, at p. 199; see *Santiago County Water Dist.* v. *County of Orange* (1981) 118 Cal.App.3d 818, 829-831 [173 Cal.Rptr. 602].)

■ Our determination that the EIR was not legally adequate when certified is guided by the legislative intention that CEQA ". . . be interpreted

in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].) We are mindful of the legislative declaration that it is the policy of this state to "[p]revent the elimination of . . . wildlife species due to man's activities, insure that . . . wildlife populations do not drop below self-perpetuating levels, and preserve for future generations representations of all plant . . . communities. . . ." (§ 21001, subd. (c); see also Fish & G. Code, § 1755.) It is state policy ". . . that public agencies should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects, and that the procedures required by this division are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects. . . ." (§ 21002.)

". . . CEQA compels an interactive process of assessment of environmental impacts and responsive project modification which must be genuine. It must be open to the public, premised upon a full and meaningful disclosure of the scope, purposes, and effect of a consistently described project, with flexibility to respond to unforeseen insights that emerge from the process." (*County of Inyo* v. *City of Los Angeles* (1984) 160 Cal.App.3d 1178, 1185 [207 Cal.Rptr. 425].) "Only by requiring the County to fully comply with the letter of the law can a subversion of the important public purposes of CEQA be avoided. . . ." (*People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 842 [115 Cal.Rptr. 67].)

*Attorney's Fees*

Appellants request attorney's fees pursuant to Code of Civil Procedure section 1021.5, providing for an attorney's fee award to a successful litigant in an action resulting in enforcement of an important right affecting the public interest. The trial court is better equipped to consider the issues of fact regarding the appropriateness of such award and the amount thereof. (See *Twain Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664, 706 [188 Cal.Rptr. 233].) Therefore, we deny appellants' application without prejudice to their right to bring a motion for attorney's fees, including those incurred on appeal, in the trial court.

The judgment is reversed and the cause remanded with directions to the trial court as follows:

1. To issue a writ of mandate directing respondent to void its certification of the final EIR and approval of tentative tract map number 3720.

2. To issue an order enjoining respondent and real parties in interest from approving or carrying out the project until an EIR in compliance with CEQA has been prepared and all other CEQA prerequisites satisfied.

3. To consider, upon proper motion, appellants' request for attorney's fees pursuant to Code of Civil Procedure section 1021.5.

The temporary stay orders filed November 6, 1984, and November 20, 1984, shall remain in effect until the superior court has issued its order as directed hereinabove.

Stone, P. J., and Gilbert, J., concurred.