[No. H006051. Sixth Dist. July 16, 1990.]

SIERRA CLUB et al., Plaintiffs and Appellants, v.
GILROY CITY COUNCIL, Defendant and Respondent;
SHAPELL INDUSTRIES OF NORTHERN CALIFORNIA, INC.,
Real Party in Interest and Respondent.

COUNSEL

Bruce Tichinin for Plaintiffs and Appellants.

Berliner, Cohen & Biagini, Andrew L. Faber, Linda A. Callon and Russell J. Hanlon for Defendant and Respondent.

Bernard & Wood, Steven M. Bernard and Elise M. Balgley for Real Party in Interest and Respondent.

OPINION

COTTLE, J.—Plaintiffs Sierra Club and Richard Pontius appeal from a judgment denying their petition for writ of mandate. They seek to compel defendant Gilroy City Council (City) to set aside its certification of an environmental impact report (EIR) and its associated approval of a general plan amendment for failing to (1) insure the continuing viability of the California tiger salamander (California Tiger Salamander), (2) deny approval because there were feasible alternative sites for the project, (3) require a supplemental EIR on the salamander, (4) prepare a cumulative impact report discussing other projects statewide, and (5) make a determination

whether the California Tiger Salamander was a rare or endangered species. We shall affirm.

## FACTS

On July 20, 1987, real party in interest Shapell Industries of Northern California, Inc. (Shapell) applied to the City to amend the designation of a 1,716-acre parcel of unimproved land, known as O'Connell Ranch, from "rural residential and hillside residential" on the City's general plan to "low density residential and hillside residential." Shapell sought to build a residential development on the parcel. The "Conceptual Development Plan" for the project called for 486 acres to be set aside for open space and recreation, 239 acres for residential development, 964 acres of hillside preserve, and 27 acres for streets.

On December 3, 1987, City engaged a consultant to prepare an EIR for the project. The consultant subsequently subcontracted out the wildlife section of the EIR to an environmental consulting firm, LSA Associates, Inc. (LSA). On April 20, 1988, the City's planning department sent out a notice of preparation of EIR to various individuals and entities including the California State Department of Fish and Game.

The Department of Fish and Game (sometimes hereafter Fish and Game) responded to the City's notice by suggesting that there be further analysis of the impact of the project on the habitats of indigenous plants and animals. Subsequently, the draft EIR was completed and circulated. The document concluded that the project would significantly reduce the present wildlife habitat value of the site and proposed several mitigation measures, including use of native trees and plant materials and use of golf course water to replace loss of stock ponds.

On July 28, 1988, plaintiff Richard Pontius submitted a written comment on the draft EIR in which he expressed concern about the impact of the O'Connell Ranch project on various species of animal including the California Tiger Salamander. The California Tiger Salamander is an ancient amphibian which spends most of its time underground in the burrows of ground squirrels, gophers, badgers, and other animals. It emerges from the burrows only for brief periods during or following rains to breed and lay eggs in seasonal ponds or slow-moving streams. One such breeding pond is located on the O'Connell Ranch. On August 10, 1988, Fish and Game submitted further comments, expressing its concern over the loss of 454 acres of wildlife habitat to suburban uses.

On August 22, 1988, the public was notified of a planning commission meeting set for September 1 on the Shapell project. In preparation for that

meeting, the planning commission issued a staff report indicating that the project would have a significant impact on grassland, woodland and riparian habitat. Pontius testified about the California Tiger Salamander at this meeting and indicated that 15 to 30 acres of habitat might be sufficient to protect the California Tiger Salamander.

On September 6, 1988, Pontius again testified at a duly scheduled meeting of the city council. He requested that a decision on the EIR be deferred until a study of the California Tiger Salamander through one complete breeding cycle (Nov. 1988-May 1989) could be conducted, preferably by renowned herpetologist, Dr. Robert Stebbins. Pontius's attorney also testified regarding alleged inadequacies in the draft EIR, which deficiencies he set forth in greater detail in a letter sent to the City the following day. In response, the City voted to continue its hearing until October 3 and to commission a study of the impact of the project on the California Tiger Salamander habitat.

After Malcolm Sproul, LSA's consultant, gave an oral report of his findings in the California Tiger Salamander study to the City on October 3, 1988, Pontius again testified expressing disagreement with Sproul's data and opinions. Sproul had pointed out that the California Tiger Salamander had been found in 117 locations in 27 counties in central California including 11 fully protected sites. Pontius asked that the City wait for completion of a study of the California Tiger Salamander, which Stebbins estimated would take a year to complete. On October 17, 1988, Sproul completed his written report. He noted that the California Tiger Salamander had been observed at two sites in Gilroy, that it was designated by the United States Fish and Wildlife Service as a "Category 2 candidate" species, meaning that there is insufficient biological data available to justify listing the species as threatened, and by the Department of Fish and Game as a species of "special concern," meaning that the species has a declining population and is being monitored for future listing. Sproul listed six mitigation measures to protect any California Tiger Salamander population at the O'Connell Ranch site, including the preservation of fifty acres surrounding the California Tiger Salamander breeding pond as open space.

Thereafter, on October 24, 1988, the City prepared its proposed final EIR on the project, consisting of the draft EIR, written comments on the draft EIR, revisions to the text of the draft EIR, and the LSA report. The City sent a copy of this proposed final EIR to the Department of Fish and Game for its review and comments and published a public notice indicating that a "Preliminary Final EIR" had been prepared and was available for public review and written comments. The notice stated that comments had to be

received by the city council by November 2, 1988, as they would vote on the final EIR on November 7.

City received several written responses to the preliminary final EIR including one from Pontius and one from Pontius's attorney. Sierra Club entered the proceedings on November 2 in support of the position taken by Pontius. The Department of Fish and Game also sent a written response to the City in which it endorsed the environmental review of the California Tiger Salamander and recommended that, in addition to the six mitigation measures proposed by Sproul, the City also adopt five further mitigation measures including creating a fifty-acre conservation easement, prohibiting the use of chemicals or the stocking of fish in the breeding pond, limiting construction near the pond to April 15 through December 1 (the time the California Tiger Salamander is underground), limiting other construction activities, and constructing a second breeding pond.

The city council approved the general plan amendment and certified the EIR at its November 7, 1988, closed meeting. At the same time, City adopted every mitigation measure proposed to protect the California Tiger Salamander and adopted certain findings, mitigation measures and statements of overriding considerations relating to the EIR. City determined that the project would not result in a significant cumulative effect on the California Tiger Salamander because populations of California Tiger Salamander were scattered throughout the state, the mitigation measures should reduce the impact to insignificance, and other California Tiger Salamander populations had been sighted in Gilroy. Finally, City determined that other project sites were infeasible.

On December 8, 1988, plaintiffs filed the instant action seeking a writ of mandate to compel the City to set aside its certification of the EIR. The grounds were essentially the same grounds urged here on appeal. By the time the case went to trial on June 8, 1989, Dr. Robert Stebbins had conducted a 75-hour study of the California Tiger Salamander, the results of which plaintiffs attempted to introduce into evidence. The court determined that the Stebbins report was inadmissible and denied the petition for writ of mandate. This appeal followed.

### STANDARD OF REVIEW

■ In an action to set aside an agency's determination under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000

et seq.),[1] the appropriate standard of review is determined by the nature of the proceeding below. Focusing on the language of the two judicial review CEQA provisions, the Supreme Court concluded that section 21168 "establishes the standard of review in administrative mandamus proceedings" under Code of Civil Procedure section 1094.5 while section 21168.5 "governs traditional mandamus actions" under Code of Civil Procedure section 1085. (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 392, fn. 5 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights*).) The former section applies to proceedings normally termed "quasi-adjudicative," "in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency . . . ." (§ 21168; Selmi, *The Judicial Development of CEQA* (1984) 18 U.C. Davis L.Rev. 197, 221-222, hereafter Selmi.) The latter section applies to all other actions taken pursuant to CEQA and generally encompasses "quasi-legislative" decisions made by a public agency. (Selmi, at p. 222; Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (4th ed. 1990) pp. 225-231, hereafter Remy.)

■ Legislative actions are political in nature, "declar[ing] a public purpose and mak[ing] provisions for the ways and means of its accomplishment." (*Fishman* v. *City of Palo Alto* (1978) 86 Cal.App.3d 506, 509 [150 Cal.Rptr. 326].) In contrast, adjudicative actions apply law that already exists to determine "specific rights based upon specific facts ascertained from evidence adduced at a hearing." (*City of Rancho Palos Verdes* v. *City Council* (1976) 59 Cal.App.3d 869, 883 [129 Cal.Rptr. 173], disapproved on another ground in *Heist* v. *County of Colusa* (1984) 163 Cal.App.3d 841, 846 [213 Cal.Rptr. 278].)

■ The amendment of a general plan has been held to be a quasi-legislative action. (*Yost* v. *Thomas* (1984) 36 Cal.3d 561, 571 [205 Cal.Rptr. 801, 685 P.2d 1152].) Consequently, it is governed by section 21168.5.[2]

■ Under both section 21168 and 21168.5, the agency's action will be overturned only if it does not comply with the procedure required by law or

[1] All statutory references are to the Public Resources Code unless otherwise indicated. All references to California Code of Regulations, title 14, section 15000 et seq. will be referred to as "Guidelines."

[2] Recently, in *Schaeffer Land Trust* v. *San Jose City Council* (1989) 215 Cal.App.3d 612, 621 [263 Cal.Rptr. 813], we incorrectly held in an action to set aside an agency's decision to amend a general plan that "section 21168 dictates the correct standard of review for this case." Because it is in conflict with the Supreme Court opinion in *Laurel Heights, supra,* we take this opportunity to correct it. We point out, however, that the outcome of the case was not impacted by the application of the incorrect standard. As the Supreme Court noted in *Laurel Heights,* "the standard of review is essentially the same under either section, i.e., whether substantial evidence supports the agency's determination." (*Laurel Heights, supra,* 47 Cal.3d at p. 392, fn. 5.)

is not supported by substantial evidence. (Guidelines, § 15091, subd. (b).) In applying the substantial evidence standard, "the reviewing court must resolve reasonable doubts in favor of the administrative findings and decision." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12].) "A court may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. [Citation.] A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so. Our limited function is consistent with the principle that 'The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.' [Citation.]" (*Laurel Heights, supra,* 47 Cal.3d at p. 393.)

■ Since the standard of review is "essentially the same" in section 21168 "quasi-adjudicative" and section 21168.5 "quasi-legislative" actions, the single important difference "between the two sections is that section 21168.5 may allow the trial court to receive evidence outside the administrative record. That argument is not available under section 21168 since it incorporates Code of Civil Procedure section 1094.5." (Selmi, *supra,* at p. 222.)[3]

---

[3] Code of Civil Procedure section 1094.5 provides, in pertinent part: "(a) Where the writ is issued for the purpose of inquiring into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer, the case shall be heard by the court sitting without a jury. All or part of the record of the proceedings before the inferior tribunal, corporation, board, or officer may be filed with the petition, may be filed with respondent's points and authorities or may be ordered to be filed by the court . . . . [¶] (b) The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence. [¶] (c) Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record . . . . [¶] (e) Where the court finds that there is relevant evidence which, in the exercise of reasonable diligence, could not have been produced or which was improperly excluded at the hearing before respondent, it may enter judgment as provided in subdivision (f) remanding the case to be reconsidered in the light of that evidence; or, in cases in which the court is authorized by law to exercise its independent

In the present case, real party argued, and plaintiffs agreed, that section 21168 and Code of Civil Procedure section 1094.5 governed this action challenging the City's decision to certify the EIR and approve the general plan amendment. As we shall explain, this misconception on the part of the court and all parties led to the erroneous exclusion of Dr. Stebbins's declaration. However, even considering Dr. Stebbins's report, substantial evidence in the record supports the administrative finding and decision to certify the EIR.

ISSUES

Plaintiffs' contentions can be grouped in essentially three categories: (1) those concerning the City's alleged "substantive" duties under CEQA; (2) those concerning City's alleged failure to follow procedural prerequisites; and (3) the evidentiary issue regarding exclusion of Dr. Stebbins's declaration and report. As noted above, we agree that Dr. Stebbins's report should have been considered by the trial court because all relevant evidence is admissible in an action challenging the sufficiency of a "quasi-legislative" act. Accordingly, we will not separately discuss this issue but will instead discuss the substance of Dr. Stebbins's report as it relates to the remaining issues.

*Substantive Standards of CEQA*

Unlike the "essentially procedural" National Environmental Quality Act (*Vermont Yankee Nuclear Power Corp.* v. *NRDC* (1978) 435 U.S. 519, 558 [55 L.Ed.2d 460, 488, 98 S.Ct. 1197]), CEQA contains substantive provisions with which agencies must comply. The most important of these is the provision requiring public agencies to deny approval of a project with significant adverse effects when feasible alternatives or feasible mitigation measures can substantially lessen such effects. (*Citizens for Quality Growth* v. *City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 440-441 [243 Cal.Rptr. 727]; § 21002; Guidelines §§ 15002, subd. (a)(3), 15021, subd. (a)(2), (c), 15041, subd. (c), 15364, 15370.)

■ ■■■ ■ ■ Relying on subdivision (c) of section 21001, plaintiffs ask this court to graft a new substantive provision onto CEQA, requiring public agencies to deny approval of any project where the perpetuation of rare or endangered species on the site cannot be guaranteed.[4] We decline to

---

judgment on the evidence, the court may admit the evidence at the hearing on the writ without remanding the case."

[4]Section 21001 sets out, in eight paragraphs, the general legislative policies underlying CEQA. Subdivision (c) indicates that it is the policy of the state to prevent elimination of fish and wildlife species due to man's activities, ensure that fish and wildlife populations do not

do so. To create such a duty would fly in the face of numerous other provisions of CEQA which permit a public agency to approve a project that will cause significant adverse impacts on the environment if it finds that "[s]pecific economic, social, or other considerations make infeasible the mitigation measures or project alternatives identified in the environmental impact report." (See, e.g., §§ 21081, subd. (c), 21002, 21002.1, subd. (c); Guidelines, §§ 15002, subd. (h)(7), 15021, subd. (d), 15093.) More importantly, in this case the record simply does not demonstrate that the California Tiger Salamander was threatened with dropping below "self-perpetuating levels" by the O'Connell Ranch project.[5]

■ Because we determined that the trial court should have admitted Dr. Stebbins's declaration and report, the normal course of action would be to remand the matter to the trial court to reconsider in light of the new evidence. However, our review of the declaration and report leads us to the conclusion that only one reasonable inference may be drawn from the excluded evidence, i.e., that the California Tiger Salamander was not threatened with dropping below self-perpetuating levels by the O'Connell Ranch project. Consequently, remanding to the trial court would serve no useful purpose.

As noted in the statement of facts, the LSA report indicated that the California Tiger Salamander had been found on 113 locations in 26 counties in central California, including 11 fully protected sites. It also indicated that the California Tiger Salamander had been observed at two locations in the vicinity of Gilroy, east of Gilroy near Pacheco Creek and east of Morgan Hill near Dunne Avenue. It further noted that the property at these two sites was undeveloped with no new development proposed for either site. Sproul noted that the California Tiger Salamander was not listed as threatened or endangered by either the federal or the state agency charged with

drop below self-perpetuating levels, and preserve for future generations representations of all plant and animal communities and examples of the major periods of California history. As we stated in *Schaeffer Land Trust* v. *San Jose City Council, supra,* 215 Cal.App.3d at page 634 and in *Towards Responsibility in Planning* v. *City Council* (1988) 200 Cal.App.3d 671, 677 [246 Cal.Rptr. 317], policy statements such as that set forth in section 21001 do not give rise to a cause of action unless there is language demonstrating a legislative intent to the contrary. We hold that the statute of limitations set forth in section 21167, subdivision (e), allowing an action for failure to comply with the provisions of CEQA to be commenced within 30 days, does not demonstrate such a legislative intent.

[5]The facts of this case are essential to our holding. Had this, for example, been a case in which the last of a particular plant or animal species existed on a future development site, a public entity's decision to nevertheless approve a project adversely impacting the species's habitat might constitute a prejudicial abuse of discretion. In the present case, however, we need not decide this issue. Because species preservation is not implicated, we need not reach plaintiffs' contention regarding the applicability, if any, of cases interpreting the federal Endangered Species Act.

designating rare species, although it was listed as a "Category 2 candidate" species for which insufficient biological information was known. Sproul further proposed six mitigation measures to minimize or eliminate any impact on the California Tiger Salamander, including the preservation of fifty acres surrounding the California Tiger Salamander breeding pond as open space.

Dr. Stebbins's report, for the most part, corroborates LSA's report. He, for example, listed 93 California Tiger Salamander population sightings for which a date was known and 96 sightings altogether. Of these, he pointed out that "over half (51.62 percent) represent observations made before 1975, and about a quarter (23.66) antedate 1970 . . . ." The converse of this proposition, however, is likewise true: over three-quarters of the sightings have been made in the last two decades and almost half in the last fifteen years. With respect to the 11 "fully protected sites," he pointed out a general "lack of information on the size and viability of [California Tiger Salamander] [(CTS)] populations within their boundaries and lack of management prescriptions for maintaining existing populations." He also identified two areas, not included in the LSA report, that "appear to be highly viable sites for the CTS if present conditions can be maintained." At one of these sites, the 50-acre pool was estimated in the winter of 1982-1983 "to contain over 200,000 juvenile CTS." Throughout the report, Stebbins stated that further research was needed before the extent of the problem would be known. In the meantime, Stebbins urged that "immediate action . . . be taken to determine the strength of populations identified in this report as perhaps the most viable among those considered [i.e., Hickman Vernal Pools, Stanislaus County; Los Flores, San Luis Obispo County; Jepson Prairie, Solano County; Concord Naval Weapons Station, Contra Costa County; Black Diamond Mines, Contra Costa County; Still Lake, Kern County; and Grant Lake, San Luis Obispo County]." He also expressed his opinion that based on his 75 hours of research on the California Tiger Salamander, conducted January through March 1988, he would recommend to the California State Department of Fish and Game that the California Tiger Salamander be placed on the list of "threatened" species.[6]

---

[6]Fish and Game Code section 2067 defines "threatened species" as: "a native species or subspecies of a bird, mammal, fish, amphibian, reptile, or plant that, although not presently threatened with extinction, is likely to become an endangered species in the foreseeable future in the absence of the special protection and management efforts required by this chapter. Any animal determined by the commission as 'rare' on or before January 1, 1985, is a 'threatened species.' " In contrast, "endangered species" is defined in Fish and Game Code section 2062 as: "a native species or subspecies of a bird, mammal, fish, amphibian, reptile, or plant which is in serious danger of becoming extinct throughout all, or a significant portion, of its range due to one or more causes, including loss of habitat, change in habitat, overexploitation, predation, competition, or disease. Any species determined by the commission as 'endangered' on or before January 1, 1985, is an 'endangered species.' "

■ Plaintiffs also contend that the City was duty bound to "not approve projects as proposed if there are feasible alternatives." We certainly agree with this proposition as a matter of law since that is the mandate of section 21002 as well as sections 21002.1, subdivision (b) and 21081. With respect to the facts of this case, however, the City found that there were no feasible alternatives and substantial evidence in the record supports that conclusion. In its "RESOLUTION . . . ADOPTING FINDINGS, MITIGATION MEASURES, AND STATEMENTS OF OVERRIDING CONSIDERATIONS," the City carefully considered, and rejected as infeasible, numerous project alternatives including the: (1) "No Project Alternative," rejected because the City had a pressing need for additional housing; (2) "fewer dwelling units—cluster alternative," rejected because it would only provide 50 percent of the dwelling units and would eliminate higher quality homes needed by the City; (3) "More Dwelling Units Cluster Alternative," rejected because it would reduce the open space and increase the environmental impacts; and (4) "Location Alternatives," rejected because they would have an impact on agricultural and farmland and would not have the benefit of preserving 964 acres of hillside open space. Additionally, the City specifically concluded that any other project alternatives would render the project economically infeasible. Sections 21002, 21002.1, and 21081 all provide that a public agency can approve a project which will have unmitigated, significant environmental effects, if the agency, as here, finds the mitigation measures or project alternatives are infeasible for economic, social, or other reasons.

*Procedural Issues*

■ Plaintiffs claim that discovery of the California Tiger Salamander after issuance of the draft EIR required preparation of a new EIR, that the two sentence cumulative impacts section of the EIR is legally inadequate, and that the City violated Guidelines section 15380 when it failed to determine if the California Tiger Salamander was threatened de facto.

The first issue implicates when a supplemental or subsequent EIR is required. The answer to that question is found in section 21166 which provides: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required . . . unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." The

Guideline governing EIR supplements requires them to be circulated and subjected to public review in the same manner as the original EIR. (Guidelines, § 15163, subd. (c).) Plaintiffs contend that new information, i.e., the presence of the California Tiger Salamander on the proposed site, which was not known and which arguably could not have been known when the draft EIR was prepared, mandated that further environmental evaluation in the form of a subsequent or supplemental EIR was required. In support of this proposition, plaintiffs refer the court to *Mira Monte Homeowners Assn. v. County of Ventura* (1985) 165 Cal.App.3d 357, 364-365 [212 Cal.Rptr. 127]. That opinion, however, was based on subdivision (b) of section 21166 while plaintiffs here rely on subdivision (c). Unlike subdivisions (a) and (b), subdivision (c) by its very terms applies only when the new information becomes available after the EIR has been certified. (Cf. *Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065, 1075, fn. 9 [230 Cal.Rptr. 413]; *Stevens* v. *City of Glendale* (1981) 125 Cal.App.3d 986, 999 [178 Cal.Rptr. 367].)

Moreover, in the present case it is clear that neither subdivision (a) (dealing with projects that are substantially changed)[7] nor subdivision (b) (dealing with substantial changes occurring with respect to the circumstances under which a project is undertaken "such as a substantial deterioration in the air quality where the project will be located" (Guidelines § 15162, subd. (a)(2)) apply.[8]

In this case, the impact of the proposed project on the California Tiger Salamander was thoroughly analyzed, acted upon, and incorporated into the final EIR. In its June 1988 draft EIR, which was sent to various state agencies and made available for public review, the City observed that the proposed project "will significantly reduce the present wildlife habitat value of the site." Plaintiff Pontius, by letter dated July 28, 1988, advised the City that the EIR needed to address the effects of the project on the California Tiger Salamander. Pontius discussed the California Tiger Salamander at the September 1, 1988, planning commission meeting and at the September 6, 1988, city council meeting. As a result of his comments, the council delayed certification of the EIR and commissioned a study on the impact of the

---

[7] Cases in which substantial changes were found include *Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929 [231 Cal.Rptr. 748, 727 P.2d 1029] [project size had been increased from six to ten acres, seating had been doubled, and the stage had been turned to face single-family dwellings adjoining the fairground] and *City of San Jose* v. *Great Oaks Water Co.* (1987) 192 Cal.App.3d 1005, 1014-1017 [237 Cal.Rptr. 845] [city intended to build three new wells, not mentioned in the EIR, which posed the risk of toxic contamination and groundwater overdraft].

[8] In *Mira Monte Homeowners Assn.* v. *County of Ventura, supra*, 165 Cal.App.3d 357, the court found substantial changes where staff of the respondent agency discovered four days before EIR certification that the original EIR underestimated the extent of wetland on the project site.

project on the California Tiger Salamander. The LSA report was presented orally at the October 3d city council meeting at which Pontius testified and was submitted in written form on October 17, 1988, including six proposed mitigation measures to minimize or eliminate any potential effect on the California Tiger Salamander. That report was made a part of a draft of the proposed final EIR (denominated the preliminary final EIR) which was again circulated to state agencies and made available for public review. The City requested and received considerable comment on the preliminary final EIR, including a letter from Fish and Game endorsing the California Tiger Salamander study and proposing five additional mitigation measures (to be added to the six mitigation measures proposed by LSA), before finally certifying the EIR on November 7, 1988.

A review of the final EIR demonstrates that the City did evaluate and respond to plaintiff's comments, as required by Guidelines section 15088. "The written responses must describe the disposition of the significant environmental issues raised in the comments (e.g., suggestions for revising the proposed project to mitigate anticipated impacts). The lead agency must specifically explain its reasons for rejecting suggestions received in comments and for proceeding with the project despite its environmental impacts. Such explanations must be 'factual,' and must be supported with specific references to empirical information, scientific authority, and/or explanatory information. The responses, moreover, must manifest a good faith, reasoned analysis; conclusory statements unsupported by factual information will not suffice. (Guidelines, section 15088, subd. (b); [citations] . . . . [¶] . . . Where the responses make important changes in the information contained in the text of the DEIR, the lead agency should either revise the relevant text or add marginal notes showing that the information is revised in the response to comments. (Guidelines, section 15088, subd. (c).)" (Remy, *supra*, at p. 118.) This is precisely the procedure followed by the City in this case.

■ Plaintiff next argues that the EIR's two-sentence cumulative impact report was inadequate. The Guidelines provide that an EIR must discuss "cumulative impacts" when they are significant. (§ 15130, subd. (a).) They are significant when "the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects[,] . . . other current projects, . . . and probable future projects." (§ 21083, subd. (b).) And, where cumulative impacts are not deemed significant, the EIR should nevertheless "briefly indicate the reasons for determining that the effect is not significant and therefore not discussing it in detail." (*Citizens to Preserve the Ojai* v. *County of Ventura* (1985) 176 Cal.App.3d 421, 429 [222 Cal.Rptr. 247].)

In the instant case, the City complied with this requirement. It concluded there were no statewide cumulative effects because 11 fully protected California Tiger Salamander sites existed and that there were no regional cumulative effects because California Tiger Salamander had been reported at two other undeveloped sites in the Gilroy area. Furthermore, the City determined that mitigation measures should minimize or eliminate any impact on the California Tiger Salamander.

 Finally, plaintiffs argue that Guidelines section 15380, subdivision (d), imposes on the public agency a duty to determine whether a species of animal or plant which is not listed as rare or endangered by any state or federal agency should be declared de facto rare or endangered. That subdivision provides: "A species not included in any listing identified in subsection (c) shall nevertheless be considered to be rare or endangered if the species can be shown to meet the criteria in subsection (b)." Subdivision (b) provides: "A species of animal or plant is: [¶] (1) 'Endangered' when its survival and reproduction in the wild are in immediate jeopardy from one or more causes, including loss of habitat, change in habitat, overexploitation, predation, competition, disease, or other factors; or [¶] (2) 'Rare' when either: [¶] (A) Although not presently threatened with extinction, the species is existing in such small numbers throughout all or a significant portion of its range that it may become endangered if its environment worsens; or [¶] (B) The species is likely to become endangered within the foreseeable future throughout all or a significant portion of its range and may be considered 'threatened' as that term is used in the Federal Endangered Species Act."

Plaintiffs claim the city council was *required* by section 15380 to make a specific finding or determination as to whether the California Tiger Salamander was "rare" or "endangered." We disagree. First, as we recently observed in *Schaeffer Land Trust* v. *San Jose City Council, supra,* 215 Cal.App.3d at pages 632-633, the Guidelines merely set forth " ' ' "indications or outlines to be followed, allowing for flexibility of action and conduct of governmental agencies . . . ." ' " Second, the discussion following that particular guideline indicates that section 15380 was intended to be directory rather than mandatory. ("The section also provides that a plant or animal *may* be treated as rare or endangered even if it has not been placed on an official list." (Remy, *supra,* at p. 415, italics added.) Third, the duty to designate a plant or animal species as rare or endangered has been delegated under the California Endangered Species Act to the Fish and Game Commission (Fish & G. Code, § 2070) and under the federal Endangered Species Act jointly to the Secretaries of Interior and Commerce. (16 U.S.C. § 1533(c).) And finally, as is set forth extensively in the statement of facts, the City took pains to protect the potentially rare California Tiger Salaman-

der by delaying certification of the EIR, by commissioning a study on it, and by adopting every mitigation measure that was proposed to assure its continuing viability.

The judgment is affirmed.

Premo, Acting P. J., and Elia, J., concurred.

A petition for a rehearing was denied August 15, 1990, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied October 11, 1990.